STATE OF RHODE ISLAND
PROVIDENCE, SC.

SUPERIOR COURT

COPLEY DISTRIBUTORS, INC.,
CHARLES FRADIN, INC., and,
C & C DISTRIBUTORS, INC.,
Plaintiffs

v.

C.A. No. PB 07-

ANHEUSER-BUSCH, INC.,
InBev U.S.A., LLC,
InBev NV/SA and
McLAUGHLIN & MORAN, INC.,
Defendants

**AFFIDAVIT OF KENNETH J. MANCINI IN SUPPORT OF**
**<u>MOTION FOR TEMPORARY RESTRAINING ORDER</u>**

I, Kenneth J. Mancini, hereby depose and state as follows:

1. I am President of plaintiff, C&C Distributors, Inc. ("C&C"), which has been a wholesale distributor of alcoholic beverages in Rhode Island for the past 38 years.

2. I have read the affidavit of Charles Fradin submitted in support of a temporary restraining order. I agree with Mr. Fradin's statements in paragraphs 5 and 6 of his affidavit regarding the competition among wholesalers for retail space and bars and other establishments selling beer.

3. C&C distributes Bass Ale, which until now has been supplied to us by defendant, InBev U.S.A. Bass Ale is the largest selling imported draft beer in Rhode Island. Bass Ale is considered to be C&C's "calling card" to its customers and is the very cornerstone of C&C's sales strategy. Our ability to successfully pursue the 1000 or so "on premises retailers" depends on the continued success of Bass Ale. Bass Ale is to C&C, what BUD is to M&M. Another way to describe the importance of Bass Ale is that it is a "door opener."

4. C&C's ability to offer Bass Ale to its customers is critical to our ability to sell other brands to those same customers. I believe that C&C will be irreparably harmed in that its good will with its customers will be permanently damaged by even a temporary loss of Bass Ale, our most important imported beer product.

5. C&C has sold Bass Ale for over 30 years in Rhode Island. We have invested substantial sums of money to market and promote the brand. To many of our customers, Bass Ale is our premier offering. In marketing our beer products, the "power of the portfolio" determines overall sales and builds the customer relationship. Any loss of Bass Ale will cause damage to our business relationships that cannot be calculated in dollars. The loss will be felt beyond Bass Ale.

6. For many years, C&C's business strategy has been to combine the sale of Bass Ale with other beers (primarily Guinness Stuout and Harp Lager) distributed by C&C. Removing Bass Ale from the C&C portfolio will dismantle a powerful combined brand selling effort at retail that C&C has spent over 30 years developing with its retail customers.

7. Imported Beers (Bass, Guinness, Heineken) represent more than half of C&C's beer business. If InBev succeeds in terminating our distribution rights merely by acting through its parent company, other suppliers will likely view Rhode Island as a state with little or no protection of its wholesale distributors. If we lose our right to distribute Bass Ale, our leading imported draft beer, the very survival of C&C is in jeopardy as other importers will likely attempt to a similar strategy in Rhode Island.

8. In the industry, it is not uncommon to offer direct marketing and promotional resources to a customer's retail establishment in return for a purchase commitment. I fully

expect that M&M will "leverage" the Bass Ale brand to sell other beer products, thereby increasing its position in the marketplace to the detriment of C&C.

9. Finally, in response to the defendants suggestion that C&C and Copley-Fradin delayed in pursuing their rights under Rhode Island law, it was not until after February 1, 2007 that we learned that we would be unable to order product from A-B's website. Neither C&C nor Copley-Fradin had been told that A-B would not honor our right to distribute the InBev brands. The sale of distribution rights from InBev to A-B was known to us in November, 2006, however, the press release expressly stated that A-B would use its wholesale distribution network in states where that is "possible." In Rhode Island, neither C&C, nor Copley-Fradin believed that it was possible for InBev USA, acting directly, or through its parent corporation, to simply terminate our rights under Rhode Island law.

10. In fact, in December, 2006, in a conference call, InBev USA's President, Doug Corbett told me, Charles Fradin and others that program/marketing commitments agreed to by InBev USA would be honored after February, 2007. We understood that to mean that we would continue to distribute the InBev brands despite the transfer of importation rights by InBev to A-B. Accordingly, until after February 1, 2007, we did not know that our distribution rights were in jeopardy.

I declare under the penalties of perjury of the law of the United States of America that the foregoing is true and correct.

KENNETH J. MANCINI